IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| STEPHEN DANIEL MONTALTO | PETITIONER |
| V. | CAUSE NO. 3:15-CV-00457-CWR-FKB |
| MISSISSIPPI DEPARTMENT OF CORRECTIONS; COMMISSIONER PELICIA E. HALL | RESPONDENTS |

## ORDER

The Court considers six items pending in the above styled case. Petitioner has filed two contempt motions, a motion seeking sanctions, and a motion to correct his request for sanctions; respondents have filed a motion to dismiss; and the Magistrate Judge has filed a Report and Recommendation.

These submissions have been allowed to remain on this Court's docket due to the extraordinary and distressing nature of the facts underlying the case, including the obstinate refusal by correctional officials and their attorneys to comply with orders of this Court. Having held two hearings to uncover—as best is possible—the truth of the matter, the Court is now ready to rule.

### I. Facts and Procedure

#### A. Background

On November 4, 2006, Stephen Montalto suffered a mental and emotional breakdown due to stress and untreated mental illness. Docket No. 41-6 at 194-96. In search of a pond he had visited in the past, he drove his car off the road, through a barbed wire fence and entered a Rankin County residential subdivision through the wrong end of a cul-de-sac. *Id.* at 199. There, he saw a woman and her two-year-old child with whom he had no previous contact. He asserts

that due to his mental state he perceived the child to be in danger. *Id.* at 195. He exited his vehicle, grabbed the child, returned to his vehicle, and despite a continued fight from the child's mother, drove away. *Id.* at 199. Montalto insists that he was looking for help. He drove to a neighbor's home and, after no answer at the door, flagged down a police car less than a mile from where he had abducted the child. *Id.* Montalto was arrested and charged with a variety of offenses related to the incident. Docket No. 41-7 at 74.

In September 2008, Montalto pleaded guilty to aggravated assault and kidnapping. *State v. Montalto*, Nos. 17,937 and 18,213 (Rankin Cty. Cir. Ct. 2008). He was sentenced to serve 20 years in the custody of Mississippi Department of Corrections ("MDOC"), and ordered to register as a sex offender upon his release. *Id.*; Docket No. 41-7 at 76; *see also Montalto v. State*, 119 So. 3d 1087 (Miss. Ct. App. 2013). Kidnapping of a minor is a sex offense in Mississippi, despite the possibility—as is the case here—of conviction without proof of any element of sexual misconduct. MISS. CODE ANN. § 45-33-23(h) ("'Sex offense' or 'registrable offense' means any of the following offenses: . . . kidnapping, if the victim was below the age of eighteen (18).").[1]

In October 2008, MDOC conducted an initial psychological evaluation of Montalto and found that he experienced delusional or paranoid thinking. Docket No. 41-7 at 108. Montalto was also diagnosed with bipolar disorder, anxiety, and depression. *Id.*

By all accounts Montalto was a model prisoner. By working several jobs as a "trusty," attending drug and alcohol classes, participating in therapy sessions, and taking advantage of

---

[1] The Court has reviewed the transcript of Montalto's plea colloquy. There is no evidence which suggests that Montalto intended to or committed a sexual act against the victim. Because the victim was under 18 years old, however, Montalto is forever required to register as a sex offender. It is not far-fetched to imagine this statute being used in pernicious ways. For example, parties involved in disputes over custody agreements may wield this statute to accuse the other of kidnapping. If the parent is convicted, he or she would be required to register as a sex offender even in the absence of intent to sexually harm the child.

other self-improvement opportunities offered by MDOC, Docket No. 41-7 at 122-56, Montalto earned more than 11 years of time toward his 20 year sentence.

As his release date drew closer, Montalto asserts, and the State does not dispute, that his mother's address was approved to serve as his post-release residence. MDOC issued a certificate approving his mother's house in Brandon on December 5, 2014. Docket No. 2 at 41-43. He was released 15 days later on Saturday, December 20, 2014. Docket No. 41-2 at 5.

The following Monday, December 22, 2014, Montalto attempted to officially register his mother's residence as his address on the Sex Offender Registry. That same day, he was notified that his mother's residence would not be approved and that he had until that evening to obtain and register a new residence. Respondents have not provided an explanation for the pre-approval then denial of this residence. Nevertheless, Montalto complied. Amazingly, he found new addresses in Jackson within the absurdly short deadline imposed by the State, moving to and registering his residence as the Billy Brumfield House that day, then the Exodus House on January 7, 2015.

Notwithstanding Montalto's apparent compliance, Rankin County Field Officer Glen McCoy issued Montalto a Rule Violation Report ("RVR"). He cited Montalto's failure to obtain an approved address and ordered his arrest on January 9, 2015.[2] Docket No. 23-2 at 1.

Twenty days later, MDOC disciplinary hearing officer Katrina Cooper says she held a hearing concerning the alleged housing violation. The evidence presented and testimony taken during the RVR hearing remain a mystery, as respondents repeatedly failed to comply with Court Orders to produce transcripts of the proceeding. But Officer Cooper apparently found Montalto guilty "based on the reporting officer's report and evidence presented at hearing." *Id.* at 2. She

---

[2] The date of offense is listed as January 9, 2015, when Montalto alleges that he was living at an approved residence he found with the help of Officer Burton of the Hinds County Sheriff's Office.

recommended revoking Montalto's earned time and reclassifying him within MDOC as a sex offender. MDOC policy mandates that Inmates serving time for sex offenses are not eligible to earn time toward early release.

**B.     This Suit**

Montalto filed this suit in April 2015, claiming that his re-incarceration and reclassification were unlawful. He specifically alleged that his conviction of kidnapping had been changed to kidnapping of a minor—making him ineligible for early release—and his earned time was revoked without due process. He requested reinstatement of his earned time and his immediate release.

On September 23, 2015, Magistrate Judge Ball ordered respondents to file within 20 days an answer or other responsive pleading, to include "full and complete transcripts of all proceedings arising from the charge of violation of Earned Release Supervision against Petitioner, as well as the revocation of Petitioner's earned time credits." Docket No. 10 at 2. Six days after the deadline passed, without requesting any extension of time, respondents filed their motion to dismiss. They argued that Montalto had failed to state a claim for relief and, in the alternative, had failed to exhaust his state remedies. Absent was any mention of hearings revoking petitioner's earned time or resulting in his re-incarceration, much less transcripts of those proceedings.[3]

In November 2015, Montalto filed his first motion for contempt. He asserted that respondents failed to follow Judge Ball's Order to produce transcripts because either those transcripts do not exist or their content is "unfavorable to the State's position, and the State is

---

[3] This was the first time the Attorney General's Office took the position that its legal argument—that Montalto had not exhausted his state court remedies—excused it from obeying Court Orders to produce transcripts. This position was reiterated during each of this Court's hearings.

4

attempting to conceal these facts." Docket No. 13 at 2. The State did not respond to Montalto's allegations.

Nine months later, in August 2016, Judge Ball entered his Report and Recommendation, advising that respondents' motion for dismissal be granted and petitioner's motion for contempt be denied. Docket No. 17. Montalto timely filed objections to the Report and Recommendation. Docket No. 19.

In October 2016, noting respondents' failure to comply with Judge Ball's Order of September 2015, this Court ordered respondents to "file full and complete transcripts of all proceedings arising from the charge of violation of Earned Release Supervision against Petitioner, as well as the revocation of Petitioner's earned time credits." Docket No. 21 at 1. Respondents again did not comply. Instead, they filed a one-page response and attached a list of the time petitioner had earned toward his early release[4] and a rule violation report. Docket Nos. 23, 23-1, and 23-2.

In light of the State's repeated failure to produce any transcripts of any proceedings, Montalto filed his second motion for contempt on November 8, 2016. He attached the MDOC policy providing that "Hearings, which may result in an offender being demoted and/or earned time taken away, will be taped," and "[s]uch tapes will be maintained for at least three years." Docket No. 24-1 at 3. Again, the State chose not to respond to petitioner's motion.

---

[4] The MDOC time sheet submitted by respondents appears to have been altered. The entry dated 11/18/08, for example, states that Montalto was removed from trusty status on 10/28/08. Docket No. 23-1 at 1. Earlier versions of his time sheet, however, do not contain this entry and instead indicate that Montalto had trusty status from 2008 through his early release in 2014. Docket No. 24-1 at 5-9. (In fact, they reveal that he took advantage of every opportunity to earn time, amassing six years and 246 days of trusty time toward his sentence.) The entry in question was not made in 2008 and Montalto was not removed from trusty status in 2008. Had Montalto been removed from trusty status in 2008, he would not have been released in 2014. Respondents have yet to account for the back-dated false submission to this Court.

5

This Court scheduled an omnibus hearing for January 20, 2017. It again directed respondents to comply with its Order of October 2016 by filing the requested transcripts or, if none existed, bringing persons responsible for making the requested records to the hearing.

The State chose the latter option. Officer Cooper testified about how her hearings generally proceed:

> Q: What is your -- I'm confused. You said you are a hearing officer.
> A:   Yes, sir.
> Q: Right?
> A:   Yes, sir.
> Q: Was there a hearing?
> A:   Yes, sir.
> Q: If you don't remember this particular hearing, tell me what is a hearing like. I mean but if you remember Mr. Montalto's particular hearing, tell me what that was. Was it a hearing?
> A:   Yes, it was a hearing, but I can't -- I can tell you what I do every day.
> Q: Tell me what you do every day.
> A:   Okay. I receive the paperwork. First I get the paperwork together from all the offenders I have for the week. I bundle it up and send it downtown to the deputy commissioner. It's a list like this where we have everything and the field officer sends it to me. And I take it and I send it to them. It was Deputy Commissioner Williams and Ms. Guherst (phonetic). Okay. They take the paperwork and they do the questioning that you are saying, the investigating and everything like that. They do that. And they send the response to me to let me know that they have investigated and this is the procedure that they want me to take. And in this situation with Mr. Montalto, they sent it back saying reclass him.

Docket No. 49 at 34-35. Following this generalized account, Officer Cooper described her process and her findings in Montalto's case:

> Q: Was that your finding -- I mean after hearing it, do you make a report? Do you write something based on the evidence that you receive as hearing officer?
> A:   It says right here on the hearing that hearing is based on the evidence the field officer sent in, that they tried to get him a residence and he didn't.
> Q: I think --
> A:   All in all this hearing was conducted and it was not to be conducted. The next day it was corrected.
> Q: But on the day that it was conducted, you were under the understanding that it should be conducted.
> A:   Yes, sir.

6

> Q: Because you are there to hear RVRs. Right?
> A:   Yes, sir.
> Q: And you indicated at your hearing -- are statements taken, oral statements taken from anyone?
> A:   Yes. You mean Mr. Montalto?
> Q: Anyone.
> A:   Yes.
> Q: Oral statements taken from -- do you recall if Mr. McCoy made any sort of oral statements?
> A:   He was not present.
> Q: He was not present?
> A:   No, sir. It was just his written documentation.
> Q: And then is it your practice to then turn to the what I'm calling the inmate, Mr. Montalto, and take evidence from him or testimony from him?
> A:   I honestly can't remember whether I -- I can't remember whether he had anything or anything, but we do allow them to say something, and I can't recall his --

*Id.* at 37-38. After testifying that she did not recall the contents of any statements taken at the RVR hearing, Officer Cooper explained why she could not refresh her memory with a transcript of the proceeding.

> A:   Okay. The transcripts for the hearing that I did --
> Q: You did the RVR hearing.
> A:   Yes, sir. And it does not exist because we were in a movement with buildings. We moved from -- we moved three times since we had this hearing. And we went to each building or whatever, they went in and they condemned the building and the paperwork and everything in there, it was -- I can't explain where it went.

*Id.* at 28-29. Officer Cooper made clear that the recordings of many MDOC disciplinary hearings were abandoned. *Id.* at 30-31 (explaining that each cassette tape is used to record multiple hearings).

Officer Cooper then explained that the contents of the hearing had no bearing on her finding Montalto guilty of the alleged housing violation. Rather, Officer Cooper testified that she found Montalto guilty because she was instructed to do so *before the hearing began*:

> Q: Now, your testimony earlier was that you were told by your superior that you were to find him guilty because he did not have a residence.

7

> A: Yes.
> Q: When were you told that?
> A: This is the sheet that I was telling you about. Not this one. I don't have it, but they were saying that process -- it's a process and it's a do not process situation with him.
> Q: Were you told that before you had your hearing?
> A: To process?
> Q: Were you told by your superior --
> A: Yes.
> Q: -- that basically you should find him guilty?
> A: Yes.
> Q: Before you had the hearing?
> A: I mean based on the evidence and the RVR and the violation packet, yes, sir. He didn't have a residence.

*Id.* at 38-39. At best, the hearing was a sham.

Officer Cooper asserted that part of the confusion arose because a second administrative hearing was held, dedicated to reclassifying Montalto as ineligible to earn any time toward his early release.[5] *See* Docket No. 49. This was the State's first mention of a separate reclassification hearing.

The Court continued its hearing to March 27, 2017, and in the interim ordered the State to "produce full and complete transcripts, documents, video recordings, audio recordings[6], and any other records that would provide evidence of Stephen Montalto's Rule Violation Hearing . . . and all reclassification hearings, resulting in the re-incarceration of Stephen Montalto after his release in 2014." Docket No. 35 at 1. Officer Cooper subsequently submitted two affidavits confessing that she was unable to locate any recording of Montalto's RVR hearing or his

---

[5] Officer Cooper and Attorney Lesley Miller repeatedly stated that the reclassification hearing—if one took place—happened the day after Montalto's RVR hearing. Docket No. 49 at 36. A review of the record, however, reveals that reclassification occurred on January 23, 2015, a week prior to the hearing taken by Officer Cooper. *See* Docket No. 41-4. Officer Cooper's reasons for holding an RVR hearing, finding Montalto guilty of a housing violation, and recommending that Montalto be reclassified, when reclassification had apparently already taken place, remain unclear.

[6] As justification for the State's failure to produce audio recordings of the hearings even after the State became aware they existed, Attorney Jerrolyn Owens argued that the Court had requested only transcripts of the proceedings. Docket No. 49 at 72. In this *fourth* Order to produce, the Court took care to state what it thought obvious from the start: audio recordings of the proceedings, to the extent they exist, are also relevant.

8

reclassification hearing.[7] Docket Nos. 41-1 and 41-3. The absence of any recording left the second proceeding in this Court largely duplicative.

## II. State's Motion to Dismiss

### A. Legal Standard

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless . . . the applicant has exhausted the remedies available in the courts of the State . . . ." 28 U.S.C. § 2254(b)(1). A habeas petitioner has failed to meet the exhaustion requirement "if he has the right under the law of the State to raise, by any available procedure, the question presented." *Id.* § 2254(c).

"[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 846 (1999).

### B. Analysis

Montalto first raised these claims through the MDOC Administrative Remedy Program. Docket No. 2 at 31. MDOC denied his request for reinstatement of his earned time and early release. *Id.*; *see also* Docket No. 41-6 at 122-23.

Since then, Montalto has not sought judicial review of that determination in any State court. His habeas petition in this Court must be dismissed for failure to exhaust, but the story does not end here.

## III. Montalto's Motion for Sanctions

### A. Legal Standard

---

[7] Montalto maintains that a reclassification hearing never happened, and the State has not presented evidence that rebuts his contention.

"The inherent powers of the federal courts are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Nat. Gas Pipeline Co. of Am.v. Energy Gathering, Inc.*, 2 F.3d 1397, 1406 (5th Cir. 1993) (quotation marks and citation omitted). That authority includes "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO*, Inc., 501 U.S. 32, 44-45 (1991). "However, courts must exercise this inherent power with 'restraint and discretion.'" *City of Alexandria v. CLECO, Corp.*, 547 F. App'x 568, 569 (5th Cir. 2013) (*Chambers*, 501 U.S. at 44). "As a general rule, a court imposing sanctions 'must use the least restrictive sanction necessary to deter thee inappropriate behavior.'" *In re Hermesmeyer*, 688 Fed. Appx. 300, 305 (5th Cir. May 2, 2017) (quoting *In re First City Bancorporation of Tex. Inc.*, 282 F.3d 864, 867 (5th Cir. 2002)). "To guide a court's discretion, we have determined that finding bad faith is a necessary predicate to issuing an inherent power sanction." *Id.* (citing *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir. 1995). "A party shows bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Ocean-Oil Expert Witness, Inc. v. O'Dwyer*, 451 F. App'x 324, 332 (5th Cir. 2011) (internal quotations and citation omitted). A party's "inconsistent statements and misrepresentations" to the court can also support a finding of bad faith. *Johnson v. Hankook Tire Am. Corp.*, 449 F. App'x 329, 334 (5th Cir. 2011).

**B.     Analysis**

In September 2016, Judge Ball ordered the production of "full and complete transcripts of all proceedings arising from the charge of violation of Earned Release Supervision against Petitioner, as well as the revocation of Petitioner's earned time credits." Docket No. 10 at 2. After the deadline set by Judge Ball and without explanation or request for extension of time, the

Attorney General's Office ignored the Order to produce and filed its responsive pleading without the requested documents. Attorney Jerrolyn M. Owens signed the pleading.

Noting respondents' failure to comply, this Court reissued an identically worded Order to produce in October 2016. Docket No. 21. The Attorney General's Office again failed to produce hearing transcripts or even acknowledge the Court's Order to do so.

In advance of its January 2017 hearing, this Court afforded respondents a third opportunity to comply with the Order to produce, by again reissuing an identically worded Order. In the State's response, filed on January 13, 2017 and again signed by Attorney Owens, respondents stated that "the hearing officer is attempting to determine whether *any recordings* of the hearing exists." Docket No. 32 at 2 (emphasis added). That response indicates that no effort was made to comply with the two prior Orders to produce.

During this Court's January 20, 2017 hearing, attorney Owens claimed to have been ignorant of the Court's interest in an audio recording of the underlying proceedings. "I wasn't sure you understand, Your Honor. But there was never a transcript, and that's what the court's order ordered us to bring. There never was one." Docket No. 49 at 72. The Court finds this ignorance was feigned in bad faith. Three Orders to produce made clear the Court's interest in any and all recordings of the underlying hearing, and based on its response, *see* Docket No. 32 at 2, the State knew that a copy of a transcript or recording would comply with the Court's request.

A fourth Order to produce, explicitly requesting "transcripts, documents, video recordings, audio recordings, and any other records," was required before respondents finally admitted that no such evidence of Mr. Montalto's re-incarceration hearings existed.

I am compelled to direct the counsel to language included in a decision from Judge Glen Davidson:

> The sanction issued . . .[seeks] to protect the sanctity of judicial decrees and the legal process. If recalcitrant litigants may subject their opponents to increased costs and delays with impunity, public confidence in the courts will be eroded. The public expects that litigants who willfully disregard court orders will not benefit from doing so. Courts do not sit for the idle ceremony of making orders and pronouncing judgments, the enforcement of which may be flouted, obstructed, and violated with impunity, with no power in the tribunal to punish the offender. In our complex society, there is a great variety of limited loyalties, but the overriding loyalty of all is to our country and to the institutions under which a particular interest may be pursued.[9]

*Auto Parts Mf'g Miss. Inc. v. King*, --- F.Supp.3d ---, 2017 WL 2957735, at *13 (N.D. Miss. June 14, 2017) (quotation marks and citations omitted).

## IV.  Other Considerations

The Court is alarmed by the facts of this case and distressed with the practices at MDOC and the Attorney General's Office uncovered during these proceedings and which may never have been exposed but for Montalto asserting that he had been deprived due process and the filing of his motions for contempt.

First, it is hard to see how the RVR "hearings" held by MDOC satisfy due process considerations. There is no way to verify the contents of proceedings or that they even take place at all, because recordings apparently are not maintained and readily abandoned. And even if the contents were knowable, they do not affect the hearing officer's determination, as Officer Cooper testified that she was instructed by MDOC executives to find Montalto guilty *before she heard any evidence*. This admission is more than troubling; it is a betrayal of justice. It casts yet another ominous cloud over the Mississippi's correctional system.[10]

---

[9] No monetary sanction will be imposed, but the Court finds that the conduct exhibited during these proceedings justify a warning. Because this officer of the court had a meritorious defense to Montalto's case (e.g., failure to exhaust), it is as if she simply felt no need to comply with the Court's directives and orders. This is unacceptable.

[10] Indeed, the citizens of our State and the world over have learned of many dark clouds in Mississippi's correctional system. *See, e.g.*, *United States v. Epps*, No. 3:14-CR-111-HTW-FKB, 2016 WL 7434483 (S.D. Miss. 2016) (indictment and conviction of corrections commissioner for bribery); *DePriest v. Walnut Grove Corr. Auth.*, No. 3:10-CV-663-CWR-FKB, Docket No. 75 at *5 (S.D. Miss. Mar. 26, 2012) (finding that the State "has allowed a cesspool of unconstitutional and inhuman acts and conditions to germinate, the sum of which places the offenders at substantial ongoing risk."); *DePriest v. Walnut Grove Corr. Auth.*, 3:10-CV-663-CWR-FKB, 2015 WL 3795020

Second, the Attorney General's Office has disregarded Court Orders, presented incomplete information, and submitted patently false statements to the Court. The State changed its position multiple times, alleging inconsistent facts. The State initially took the position that Montalto was returned to custody due to his failure to find an address that satisfied the requirements of the sex offender registry. Then, when Montalto sued and it became clear that no recording of that RVR hearing existed, the State made no effort to investigate the unrecorded or abandoned hearings, and instead flatly and repeatedly refused to comply with or even acknowledge multiple Court Orders to produce evidence of those hearings.

Then, upon being haled into this Court, the State claimed for the first time that there was a second hearing. The State asserted that a reclassification hearing was held on January 30, 2015, the day following the RVR hearing. Attorney Lesley Miller and Officer Cooper both stated that MDOC first became aware that Montalto was a sex offender and ineligible for early release on January 29, 2015. This too turned out not to be true. A simple review of Montalto's paperwork—which required *four* Court Orders for the State to produce—revealed that reclassification took place on January 23, 2015, ostensibly obviating the RVR hearing.

The nonchalance with which the State adopted false positions highlights the philosophy all too often shown by MDOC and the Attorney General's Office: ensuring just convictions obtained through just means is not a priority, or even a consideration.[11] The Attorney General's Office is treating habeas petitions as if they are something to be beaten back, rather than taken seriously and investigated. Undeniably, prisoners file many, many specious and meritless

---

(S.D. Miss. June 11, 2015) (finding the state correctional facility had failed to comply with a consent decree to provide minimally safe living conditions).

[11] In this Court's view, the conduct of the State officials violates the oath they took. Their actions are not a demonstration of faithfully discharging their duties. *See* MISS. CONST. ART. 14 § 268. The attorneys for the State are well advised to revisit *A Lawyer's Creed*. *See* The Mississippi Bar, *Lawyers Creed*, https://www msbar. org/ethics-discipline/professionalism/lawyers-creed/ (last visited Aug. 16, 2017).

13

petitions, and those who have the duty to respond may become jaded. Being jaded is one thing, but refusing to comply with directives from the court is something which cannot be excused regardless of the validity of any defenses to the claims.

Consider this: when pressed for MDOC policy details, the Assistant Attorney General repeatedly denied that she represented MDOC.[12] If this is true, who does the Attorney General's Office represent in this case?

It is not clear why the State's attorney cannot be bothered to learn and explain MDOC policy to this Court. Rather than excusing or refusing to explain MDOC policy or procedure, the Attorney General's Office should consider investigating what appears to be wholesale destruction of inmate hearing records.[13]

Without the RVR and reclassification hearings, there is no evidence to support the disciplinary action taken against Montalto or any other inmates whose hearing tapes were abandoned.

And yet, despite the lack of evidence, the State ultimately calls what it has done to Stephen Montalto a "clerical error." Docket No. 48 at 7, 29, 30; and Docket No. 49 at 7, 13, 18, 20, 50, 51. This description shocks the conscience. It avoids admitting any wrongdoing and

---

[12] Attorney Miller stated repeatedly that she was not an attorney for MDOC.
[13] Granted, many in prison have committed despicable crimes and deserve to be punished, but others have been found to be there wrongfully and under dubious circumstances. *See, e.g.*, Sabrina Butler, *I Spent More Than Six Years as an Innocent Woman on Death Row*, Time.Com/2799437/i-spent-more-than-six-years-as-an-innocent-woman-on-death-row/May 30, 2014 (last visited Sept. 29, 2017); Valerie Wells, *City Settles with Cedric Willis*, JACKSON FREE PRESS, Jan. 24, 2012, http://www.jacksonfreepress.com/news/2012/jan/24/city-settles-with-cedric-willis/ ("Willis . . . served 12 years in prison until he was exonerated in 2006 . . . ."); *Edmonds v. State*, No. 2015-CA-1788-SCT, 2017 WL 2813295 (Miss. Sup. Ct. June 29, 2017); Emily Wagster Pettus, *Man Can Seek Money for Wrongful Conviction in Mississippi*, ASSOC. PRESS, June 29, 2017, https://www.usnews.com/news/ best-states/mississippi/articles/2017-06-29/man-can-seek-money-for-wrongful-conviction-in-mississippi (Mississippi Supreme Court revived Tyler Edmonds' request for money damages for his overturned conviction and life sentence); Lici Beveridge, *$16.5M Settlement Reached in Wrongful Conviction Suit*, HATTIESBURG AMERICAN, Aug. 1, 2015, http://www.hattiesburgamerican.com/story/news/local/2016/08/01/settlement-talks-continue-wrongful-conviction-suit/87756152/ ("[T]hree men were imprisoned for decades because they were forced to confess to a crime they did not commit."). No person is stripped of all of his dignity or his right to due process upon incarceration.

completely fails to acknowledge the significance of the State's "mistake": eleven years of human life, taken back from a person who thought he had earned his freedom by doing everything that the State asked of him and having been awarded a Certificate of Earned Release Supervision by the MDOC. Docket No. 2 at 43.

## V.     Conclusion

Petitioner's motion to amend is granted. Docket No. 40. Petitioner's motions for adjudication of contempt are denied. Docket Nos. 13 and 24. Petitioner's motion for sanctions is denied. Docket No. 39. The Court adopts the Magistrate Judge's Report and Recommendation as discussed herein. Docket No. 17. Respondents' motion to dismiss is granted on the basis of petitioner's failure to exhaust his State court remedies. Docket No. 12. A separate Final Judgment will issue in accordance with Rule 58 of the Federal Rules of Civil Procedure. No Certificate of Appealability shall issue.

**SO ORDERED**, this the 29th day of September, 2017.

s/ Carlton W. Reeves<br>
UNITED STATES DISTRICT JUDGE